**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Angela Watson | No. CV-11-01393-PHX-GMS |
| Plaintiff, | **ORDER RE FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| Metropolitan Life Insurance Company, Inc. | |
| Defendant. | |

Plaintiff Angela Watson brought this action to obtain long-term disability benefits under her policy with Defendant Metropolitan Life Insurance Company ("MetLife"). The parties have filed briefs and asked this Court to proceed with a trial on the administrative record. After reviewing the administrative record and applicable law, the Court determines that Watson is able to do sedentary work so long as such sedentary work is available in the Tucson area that is amenable to the specific accommodations indicated by MetLife's physician consultant Dr. Karl Auerbach. Accordingly, Watson has failed to meet her burden of establishing that she was disabled within the meaning of the Plan.[1]

**FINDINGS OF FACT**

As of early 2008, Watson was an employee of WLB Group Inc. (A.R. at 574.) Her job was sedentary and involved planning and landscaping work at a computer. (*Id.*) She

---

[1] The Parties' requests for oral argument are denied because the parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

was a participant in WLB Group's employee welfare benefit plan ("the Plan"). (*Id.* at 292-343.) The Plan included short-term disability ("STD") and long-term disability ("LTD") benefits. (*Id.*) MetLife is the Claims Administrator, and processes claims and makes benefit determinations under the Plan. (Doc. 11 ¶ 1.) WLB Group is the Plan Administrator.

## I.     INITIAL APPLICATION

Beginning at least in March 2008, Watson began seeing her primary care doctor, Dr. Eun Lee, for pain in her lower back. (A.R. at 1003.) MRIs and X-rays revealed that Watson suffered from moderately severe central canal stenosis and mild degenerative disc disease at L4-L5. (*Id.* at 841, 915, 914, 695.) Based on her examination of Watson and the imaging results, Dr. Lee determined that Watson likely suffered from radicular pain due to a herniated disc. (*Id.* at 1005.) Dr. Lee's diagnosis evolved into a finding of lumbar degenerative disc disease, spondylosis, lumbar pain, and low back pain. (*Id.* at 556.) She recommended various work restrictions, pain medications, and physical therapy to help Watson deal with the pain. (*Id.* at 1003-08.) By July 24, 2008, however, Watson took time off work to deal with her back pain. (*Id.* at 929.) Upon recommendation of Dr. Lee, Watson also began to reduce her physical activity. (*Id.* at 1011.)

On October 22, 2008, Watson qualified for STD benefits, retroactive to July 24, 2008, and MetLife began making monthly payments. (*Id.* at 929.) A few weeks later, on November 11, 2008, Watson filed an application with MetLife for LTD benefits. (*Id.* at 1069.) Watson also applied with the Social Security Administration ("SSA") for disability benefits in December 2008 (*Id.* at 988.) Her MetLife application packet included her personal profile and notes from her office visits with various doctors. (*Id.*) In her application, she stated she "cannot sit or stand for more than 20 min[utes] due to severe pain in low back." (*Id.*) She identified  Dr. Lee as her primary physician and listed two physical therapists with whom she had been treating. (*Id.*) She described her daily routine as involving meal preparation, up to two hours of exercise, and light household

chores. (*Id.* at 1025.) Nevertheless, she stated that her pain forced her to seek help for larger tasks and to cease many other activities. (*Id.* at 1025-26.) Watson appeared open to the suggestion that she could return to some form of limited work: "I can't sit or stand still for more than 20 min[utes] at a time, so I can't do 8 [hours] sitting at a computer every day like I was doing, but if I had a 'treadmill work station' it could possibly work, or if I worked at home and could move around or rest as needed." (*Id.* at 1026.) By this time, however, her employer WL Group had laid her off due to poor economic conditions. (*Id.*)

The MetLife Policy under which Watson applied for LTD benefits contained a specific definition of disabled:

> **Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury:
> - You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
> - You are unable to earn:
>   - During the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation for any employer in Your Local Economy; and
>   - After such period, more than 60% of Your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

(*Id.* at 310.) So to qualify for LTD benefits Watson had to show that (1) she was currently receiving and complying with treatment from a physician; and (2) her condition so limited her that she could not work, first at her occupation and then—as time went on—at any occupation in her area.

As part of its review of Watson's application for LTD benefits, MetLife solicited input from Watson's physicians on possible work restrictions. (*Id.* at 1001.) Dr. Lee responded that Watson was "unable to sit > 20 min[utes] at a time[,] unable to stand > 20 min[utes] at a time[,] no lifting > 15 lbs[, and] no climbing." (*Id.* at 985.) Largely on the

basis of Dr. Lee's findings, MetLife notified Watson in December 2008 that LTD benefits had been approved retroactive to October 22. (*Id.* at 982.) MetLife noted it would continue to request updates on Watson's status from her and her physicians. (*Id.*)

In connection with her treatment for lower back pain, Watson underwent an EMG test in March 2009. (*Id.* at 898-99.) Essentially, an EMG test is a neurological exam that involves inserting a kind of needle into the area that appears to be the source of the patient's pain. (*Id.* at 556, 643.) If the patient reports pain relief, that serves as evidence that the condition is indeed the source of the pain. (*Id.*) Yet Watson reported no pain relief after the EMG test was administered. (*Id.* at 898.) Dr. Bennet Davis, who performed the test, noted that a second test would be advisable to ensure that the absence of pain relief was not due to other factors. (*Id.*)

The back pain continued, and Dr. Lee referred Watson to Dr. Kai-Uwe Lewandrowski—a spinal specialist. (*Id.* at 876-77.) Dr. Lewandrowski noted that Watson reported her standard back pain level at "7/10" and occasionally as sharp as "9/10." (*Id.* at 877.) After conducting an examination, he concluded that the L4-5 area of her spine showed signs of abnormalities, which meant that "[t]he patient may have discogenic low back pain." (*Id.* at 880.) He was more restrained in his prognosis than Dr. Lee, however, and noted that "exactly what causes lumbar disc pain is not well understood. . . . The problem is, lumbar disc degeneration is part of the normal aging process. The vast majority of degenerative discs cause no symptoms at all." (*Id.*) He concluded his note with a caution about the tricky process of determining what causes back pain:

> Diagnosis of discogenic back pain can be difficult. There are characteristic findings on physical examination, but these same findings are seen in patients with other types of back pain as well. Imaging studies can also be performed, such as MRI. However, because disc degeneration is part of normal aging, MRIs show abnormalities in patients with no symptoms as well. Therefore, it is difficult to ensure that disc pain is truly causing the symptoms, even if the disc appears abnormal on MRI.

(*Id.* at 880.)

1    **II.     DENIAL, THEN REINSTATEMENT**

2         At some point in early to mid-2009, MetLife began a regular review of Watson's

3    file to determine whether there was sufficient evidence to support an ongoing finding of

4    disability. (*Id.* at 809, 842, 929.) MetLife hired Dr. Ephraim Brenman to review Watson's

5    file, which included her test results and notes from her treating doctors. (*Id.* at 842.) Dr.

6    Brenman concluded that the medical evidence did not support any functional limitations

7    beyond June 5, 2009. (*Id.*) He noted that Watson complained of back pain, but focused on

8    the results of the EMG, which he felt ruled out the degenerative disc found at L4-5 as the

9    source of Watson's pain. (*Id.*) He found no medical documentation to support a diagnosis

10   of radiculopathy or myelopathy, two neurological diseases Dr. Lee thought were present

11   in Watson's case. (*Id.*) On August 28, 2009, MetLife advised Watson that it was denying

12   LTD benefits beyond June 5, 2009. (*Id.* at 809.) In its denial letter, MetLife advised

13   Watson that it had not received any information from Dr. Lewandrowski, ostensibly

14   because Dr. Lewandrowski required a fee for the records and Watson had not yet paid the

15   fee. (*Id.* at 929.) MetLife instructed Watson to supplement her file with any additional

16   information if she wanted a re-evaluation of the decision. (*Id.*)

17        Watson submitted a note from her office visit with Dr. Lee on August 17, 2009.

18   (*Id.* at 835.) Dr. Lee disagreed with Dr. Brenman's conclusions, but recommended that

19   Watson receive another EMG exam. (*Id.* at 846.) Dr. Lee's comments did not change Dr.

20   Brenman's mind: "The claimant complains of mainly subjective low back, mid-back and

21   neck pain without objective findings." (*Id.*) Nonetheless, on September 14, MetLife

22   notified Watson that it was reinstating her LTD benefits while it developed further

23   medical evidence on her claim. (*Id.* at 810.) MetLife claimed that the reinstatement

24   occurred to allow time for the second EMG exam recommended by Dr. Lee (*id.* at 846)

25   that could shed light on whether the L4-L5 disc degeneration was in fact the source of

26   Watson's pain. (*Id.* at 810.)

27        Meanwhile, Watson began to experience severe gastrointestinal ("GI") pain and

28   sought medical help from Dr. Lee. (*Id.* at 732.) Dr. Lee referred Watson to Dr. Wataru

Tamura in late 2009 to run tests for inflammatory bowel disease ("IBD") or Crohn's disease, two GI conditions. (*Id.* at 427.) In the end, Dr. Tamura found the tests inconclusive: "NO conclusion can be made regarding whether the patient has Crohn's disease. . . . Certainly the patient has symptoms compatible with irritable bowel syndrome (IBS). . . ." (*Id.*) He recommended some significant dietary adjustments and careful food preparations. (*Id.* at 526.) No further examinations or tests were performed relative to Watson's GI pain. Watson had her last visit with Dr. Tamura on February 18, 2010. (*Id.*)

Dr. Lee also referred Watson in September 2009 to a neurologist, Dr. Michael Badruddoja, in order to clarify Watson's spinal condition. (*Id.* at 783.) Dr. Badruddoja performed a series of tests and examined Watson's previous MRIs. (*Id.*) He found that she had "a fairly significant arthritic back with a fair amount of end plate degeneration of the L4-5 level." (*Id.* at 784.) He recommended another "EMG of both lower extremities to evaluate for the potential of radiculopathy," but noted "it does not appear clinically that there is any type of radicular symptoms." (*Id.*) Watson had another EMG on October 20, 2009, which produced a result similar to her March 2009 test. (*Id.* at 785.)

Also on October 20, 2009, MetLife sent Watson a letter requesting updated medical information. (*Id.* at 775.) Watson responded by supplementing the list of her treating physicians: she added Dr. Tamura as her GI doctor and Dr. Badruddoja as her neurologist. (*Id.* at 776.) Despite the presence of another normal EMG, MetLife did not take any action at this time on Watson's LTD benefits.

On January 19, 2010, Dr. Lee submitted a package of materials to MetLife as part of its ongoing evaluation of Watson's disability claim. (*Id.* at 728.) Under "Subjective Symptoms," Dr. Lee listed "chronic back pain," and under "Objective Findings," Dr. Lee listed "spinal stenosis and Crohn's [disease]." (*Id.* at 729.) The GI specialist, Dr. Tamura, however, had not previously made a diagnosis of Crohn's disease. (*Id.* at 427.) Most of Dr. Lee's findings appear to be based on Watson's back pain. She marked Watson as a Class 5 (the highest) for "Psychological Functions", which means "Patient has significant

1 loss of psychological, physiological, personal and social adjustment (severe limitations)."

2 (*Id.* at 730.) Dr. Lee opined that Watson could not sit or stand for an extended period,

3 could walk for one hour intermittently, and could  occasionally lift up to 10 lbs. (*Id.*) She

4 felt Watson could work "a total of <1 hours per day" and did not expect any

5 improvement. (*Id.*) Under the box labeled "Restrictions", Dr. Lee listed "No sitting or

6 standing [for a] prolonged period, no lifting, bending, [or] stooping, and [n]eed[s] to

7 change position often." (*Id.*) January 2010 appears to be the last time Watson saw Dr.

8 Lee.

9   On March 8, 2010, Watson received a letter from MetLife, which informed her

10 that she was still considered disabled and that the definition of "disability" for her claim

11 would be changing as of October 21, 2010. (*Id.* at 714.) The Policy specifies that after 24

12 months, the definition of disability contracts from "[u]nable to earn . . . more than 80% of

13 Your Predisability Earnings at Your Own Occupation for any employer in Your Local

14 Economy" to "[u]nable to earn . . . more than 60% of Your Predisability Earnings from

15 any employer in Your Local Economy." (*Id.* at 310.) MetLife asked Watson to provide

16 updated information. (*Id.* at 714.)

17   By March 2010, Watson was seeing Dr. Richard Chua, a neurosurgeon, about her

18 degenerative disc. (*Id.* at 641.) After reviewing her medical history, Dr. Chua concluded

19 that Watson "clearly has a syndrome of mechanical low back pain. This is likely due to

20 the significant degenerative disc changes at L4-5 which seems to have progressively

21 worsened. The MRI findings are actually quite impressive. Even though she did not

22 report the typical response to the analgesic discogram [EMG], I think it would be hard to

23 ignore the MRI findings." (*Id.* at 643.) Spinal fusion surgery was scheduled for April 23,

24 2010. (*Id.* at 524.) Dr. Chua told MetLife that Watson would unable to work for at least

25 six to eight weeks after her surgery. (*Id.* at 655-56.)

26   The surgery did not go well. During the operation, the common iliac vein was

27 nicked, forcing Dr. Chua to abort the operation and call for the assistance of Dr. Scott

28 Berman, a vascular surgeon. (*Id.* at 524.) The complication was potentially very severe.

(*Id.*) Both doctors treated her over the next six weeks to prevent the onset of deep vein thrombosis. (*Id.*) After those six weeks, there was no evidence of complications related to the ligation of the common iliac vein. (*Id.*) Watson's last visit with Dr. Chua was few weeks later, on July 19, 2010. (*Id.*)

Later, Watson learned she had succeeded in her application for Social Security disability benefits. (*Id.* at 529.) On September 23, 2010, an ALJ awarded her full disability benefits retroactive to July 23, 2008. (*Id.* at 529.) The ALJ found her disabled because of "degenerative disc disease of the lumbar spine" and "surgically induced deep vein thrombosis," despite Drs. Chua and Berman determining that there were no long-term complications from the surgery. (*Id.* at 531.) The ALJ did not find any evidence that the GI impairments were severe. (*Id.*) The ALJ concluded that "[t]he claimant has the residual functional capacity to perform less than a substantial range of sedentary work activities as defined in [applicable regulations] because of a need to elevate her leg several times per day and change position at will." (*Id.*) He considered Watson's own testimony as well as document and opinion evidence from Watson's physicians and the agency physician. (*Id.* at 532-33.) He specifically credited the opinions of Dr. Lee and Watson's physical therapist over the opinion of the state agency physician because "it [came] from a nontreating source and is inconsistent with the claimant's allegations, testimony, and the medical evidence as a whole." (*Id.* at 533.)

## III.    SECOND DENIAL AND APPEAL

Around the same time, MetLife began its transitional review of Watson's claim, and informed her that they were seeking updated evidence. (*Id.* at 175-77.) At some point before the review, Watson told MetLife that she no longer had health insurance and had not scheduled any further appointments with her physicians. (*Id.* at 177.) Dr. McPhee was the physician consultant assigned to review Watson's file. (*Id.* at 552.) On October 8, 2010, he reviewed all of the meetings with physicians from 2007-2010 and related tests and surgeries. (*Id.* at 552-61.) He found that some doctors, like Dr. Lee, had stated Watson was unable to work at all, while some of the physical therapists had stated

1    Watson could do some sitting and standing. (*Id.* at 558-59.) Dr. McPhee examined the

2    normal EMG test as well as the MRI evidence that Watson had degenerative disc disease

3    at L4-5. (*Id.* at 557-60.) He attempted to contact Dr. Chua to get his opinion, but did not

4    hear back. (*Id.* at 563.) In answer to the question "Does the medical information support

5    physical functional limitations beyond 10/22/10?", Dr. McPhee determined that

6    "[r]easonable physical functional limitations given her disc degeneration at L4-5 would

7    be to avoid lifting more than 20 pounds occasionally and 10 pounds frequently, to stoop

8    no more than occasionally, and to be allowed brief position changes for comfort. A sit

9    stand work station could be considered." (*Id.* at 562.) These limitations were not as strict

10   as those stated by Dr. Lee. (*Id.* at 730.) He discounted Dr. Lee's finding that Watson was

11   "not capable of working her sedentary job" because "[t]he attending physician forms

12   completed by her providers . . . appear to be based on [Watson's] self reported

13   complaints." (*Id.* at 562.)

14   As MetLife was preparing the denial file, it received notice of the favorable SSA

15   decision. (*Id.* at 188-89.) A notation on Watson's file stated "need to add SSA language

16   as we just received a favorable decision notice from SSA. Has not been processed yet.

17   Once you add the SSA letter it is ok to send." (*Id.* at 188-89.) On October 21, 2010,

18   MetLife notified Watson that her LTD benefits were cancelled because Dr. McPhee

19   indicated Watson was capable of performing a sedentary job (*Id.* at 188.) Watson was

20   distraught. (*Id.* at 189.) MetLife advised her that Dr. Chua had not responded and that she

21   should review the denial file, see whether any information was missing, and update

22   accordingly. (*Id.* at 189-90, 573-75.)

23   On November 17, 2010, MetLife heard back from Dr. Chua's office. Claim notes

24   indicate that his secretary "advised that she received the notification that [MetLife] sent

25   over [Dr. McPhee's report] and she is not sure what needs to be done. HCP [Dr. Chua]

26   agrees with the answers at the end of form [and] she needs call back with further info on

27   what to do if we need [Dr. Chua] to send note advising of such." (*Id.* at 196-97.) The

28   answers referenced in the note appear to be the findings of Dr. McPhee relating to

workplace limitations. Dr. Chua's office faxed back Dr. McPhee's report with the following text on the front: "Unsure what you need from us. Dr. Chua reviewed and agree w/ questions. (He Agreed)" (*Id.* at 546) (emphasis in original).

As part of the appeal process, Dr. Tamura prepared a letter to MetLife on January 7, 2011. (*Id.* at 526.) He noted that he last saw Watson on February 8, 2010, almost a year earlier. (*Id.*) In the letter, he focused on the GI issues. (*Id.*) Dr. Tamura opined that Watson had "an inflammatory condition that . . . appears indistinguishable from inflammatory bowel disease (IBD) or Crohn's disease." (*Id.*) In a later letter, however, Dr. Tamura revised his statement: "At the time that it was checked in the winter of 2009, NO conclusion can be made regarding whether the patient has Crohn's disease. . . . Certainly the patient has symptoms compatible with irritable bowel syndrome (IBS) which is defined as visceral hypersensitivity or sensitivity of the intestine." (*Id.* at 427.) He expressed his agreement with Dr. McPhee that the GI condition would not cause functional impairment. (*Id.*)

Dr. Chua also filed a letter in connection with Watson's appeal. (*Id.* at 524.) He described the April 2010 operation and its subsequent complications, but also stated that Watson did not have lasting issues relating to the common iliac vein injury. (*Id.*) He related Watson's report of "being unable to sit for longer than about 20 to 30 minutes[] without significant low back pain." (*Id.*) He noted that he had not seen Watson since July 19, 2010, and that he maintained his recommendation of surgery for her at that point. (*Id.* at 524-25.) He concluded his letter by stating that Watson would "likely continue to have low back pain related to the L4-5 degenerative disc, until she successfully completes surgical intervention." (*Id.* at 525.) He gave no opinion on Watson's ability to work, and if so, what limitations would be required.

At the end of January 2011, Watson sent in her formal letter of appeal which MetLife forwarded to its appeals division. (*Id.* at 523, 365, 202-03.) In her appeal, Watson stated that she is disabled due to three conditions: (1) her spinal condition, (2) complications from the April 2010 surgery, and (3) Crohn's disease and chronic gut pain.

(*Id.* at 523.) Watson reported an inability to stand or sit normally in a chair longer than 20 minutes, persistent leg swelling, and a need to lie down often. (*Id.*) She included the Tamura and Chua letters and the favorable SSA ruling. (*Id.* at 202-03.) No information was included from Dr. Lee.

A different physician consultant, Dr. Karl Auerbach, reviewed the information submitted in Watson's appeal on February 27, 2011. (*Id.* at 429-39.) Dr. Auerbach found that Dr. Tamura's letter did not assign any functional impairment to Watson based on her Crohn's/IBS/IBD symptoms. (*Id.* at 429.) He noted that Dr. Chua told him he could not comment on Watson's impairment level because he had not treated her since July 19, 2010. (*Id.* at 503.) Like Dr. McPhee, Dr. Auerbach canvassed Watson's medical history, indicating that from 2007 to 2008, there were consistent diagnoses of severe degenerative disc problems. (*Id.* at 432-33.) Treatment from 2008 to 2009 resulted in varying degrees of pain relief, though more often than not the relief was minimal. (*Id.* at 433-34.) He reviewed all of the tests and diagnoses up until mid-2010, when it appears Watson ceased visiting her physicians. (*Id.* at 433-37.) He concluded that Watson could work, but required limitations in the workplace, including limits on bending and squatting, a 10 lb. limitation on lifting or carrying, and the ability to sit or stand as needed for comfort. (*Id.* at 438.) He recommended a sit/stand work station. (*Id.*) These were more severe restrictions than were recommended by Dr. McPhee. (*Id.* at 562.)

In the time since Watson had submitted her appeal, Dr. Tamura sent his second letter where he agreed that there was no functional impairment from the Crohn's/IBS/IBD symptoms. (*Id.* at 427.) Dr. Berman also submitted a letter in which he stated that he last saw Watson on June 11, 2010, and that she did not have significant complications from the April 2010 surgery and ligation of the iliac vein. (*Id.* at 421.) Dr. Auerbach filed an addendum to his review on April 14, 2011, in which he considered the letters and determined that they only bolstered his conclusion that there was no functional impairment from the GI or vascular issues. (*Id.* at 396-97.) He recognized that, although there were no current records, it would be reasonable to assume that Watson continued to

take her pain medication. (*Id.* at 398.) He determined that "[t]he key side effect would be potential for a lack of attention and alertness regarding safety sensitive activity. This should not impact the type of work she was doing." (*Id.*) In addition, he expressly took note of the SSA decision, including the fact that the ALJ credited the treating physician and subjective complaints over state agency reviewer. (*Id.* at 399.) Dr. Auerbach stated that he was not ignoring the spinal issue, pointing to the significant limitations he included and the fact that those limitations were much stricter than those recommended by the state agency reviewer. (*Id.*) Finally, he thought the ALJ decision carried less weight because the ALJ had improperly concluded that Watson had deep vein thrombosis, when later information from Dr. Berman revealed she did not. (*Id.*)

After Dr. Auerbach filed his report, one of MetLife's vocational analysts conducted a review to determine what vocational alternatives existed in the geographic area. (*Id.* at 382-83.) It does not appear the vocational analyst examined Watson's actual records; rather, she reviewed the claim notes and Dr. Auerbach's report. (*Id.*) The analyst identified three occupations suitable for Watson in the Tucson area: Service Clerk, Order Clerk, and Repair Order Clerk. (*Id.* at 383.)

On April 27, 2011, MetLife formally notified Watson that her appeal was denied. (*Id.* at 237.) It sent a letter, which focused on the information provided by Drs. Berman and Tamura. (*Id.* at 364-69.) On July 14, 2011, Watson brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 et. seq. The Parties have filed their trial briefs and the administrative record, and this matter became ripe for adjudication on July 23, 2012.

## CONCLUSIONS OF LAW

### I.     LEGAL STANDARD

The standard of review in a case involving denial of benefits is de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th

Cir. 2008). The parties agree that no such language exists in the Plan, and the Court reviews the administrative record de novo.

ERISA declares that an employee benefit plan "shall afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). "Full and fair review" must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). "However, because ERISA grants employers 'large leeway to design disability . . . plans as they see fit,' full and fair review does not require an administrator to credit evidence that cannot support a disability determination under the plain language of a plan." *Peterson v. Fed. Express Corp. Long Term Disability Plan*, CV-05-1622-PHX-NVW, 2007 WL 1624644 at *25 (D. Ariz. June 4, 2007) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003)).

When a court reviews a denial of benefits de novo, it accords no deference to the decision of the claims administrator. *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1298 n.4 (9th Cir. 2010). "In a trial on the administrative record, the Court 'can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.'" *Gemmel v. Systemhouse, Inc.*, CIV 04-198-TUC-CKJ, 2009 WL 3157263 at *11 (D. Ariz. Sept. 28, 2009) (quoting *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir.1999)). Nevertheless, the burden rests squarely on the plaintiff to prove that she was totally disabled at the time benefits were terminated. *Muniz*, 623 F.3d at 1294; *Schwartz v. Metropolitan Life Ins. Co.*, 463 F. Supp. 2d 971, 982 (D. Ariz. 2006) ("Plaintiff has the burden of proof to show that he was eligible for continued long term disability benefits based on the terms and conditions of the ERISA plan.").

1    **II.    DISCUSSION**

2    **A.    The Plan**

3    For Watson to qualify for LTD benefits, she must meet the plan's definition of

4    disabled. The Plan requires Watson to submit "written evidence satisfactory to [MetLife]

5    that [she] has . . . establish[ed] the nature and extent of the loss or condition; [MetLife's]

6    obligation to pay the claim; and [Watson's] right to receive payment." (*Id.* at 313.) The

7    Plan has two requirements relevant to the current case. First, Watson must demonstrate

8    that she is "receiving Appropriate Care and Treatment and complying with the

9    requirements of such treatment." (A.R. at 310.) Thus, she must show current medical care

10   and treatment from physicians that demonstrate a disabling condition. (*Id.*) Second,

11   because Watson is contesting the award of LTD benefits beyond October 21, 2010, she

12   must show that she is "unable to earn . . . more than 60% of [Her] Predisability Earnings

13   from any employer in [Her] Local Economy at any gainful occupation for which [She is]

14   reasonably qualified taking into account [Her] training, education and experience." (*Id.*)

15   In other words, Watson must put forth evidence that her conditions are so limiting that

16   working at a job where she would earn at least 60% of her previous salary is impossible.

17   The Plan describes the type of evidence that Watson must provide when she filed her

18   claim: documentation of the date, cause, prognosis, and continuity of her disability;

19   application for other benefits; all medical information, including x-rays and medical

20   records; and all information relating to her treatment. (*Id.* at 333-34.) There must be

21   sufficient evidence to satisfy both elements for an award of benefits to follow.

22   **B.    Weight Assigned to MetLife's Determinations**

23   Watson focuses a significant portion of her Trial Brief on alleged problems with

24   the process of review that MetLife conducted. These range from failing to consider her

25   favorable SSA decision to not giving proper weight to her treating physicians. MetLife,

26   in turn, claims that, since the standard of review is de novo and not abuse of discretion,

27   none of these points matter. MetLife correctly identifies the appropriate standard of

28   review but incorrectly applies it. This proceeding is a trial on the administrative record,

and Watson's allegations go to the weight that the Court should assign the evidence and conclusions of the MetLife consultants. If all of these issues would be relevant in an abuse of discretion case, they are just as relevant in a de novo case. Therefore, Watson's various claims regarding the MetLife review process are relevant to the credibility of MetLife's evidence.

### 1.   Failure to Give Proper Weight to Treating Physicians and Documentary Evidence

Watson contends that MetLife did not give proper deference to the findings and claims of the physicians who treated her and the X-rays and MRIs that showed degenerative disc disease. Each time a consultant reviewed her record, however, he catalogued each of Watson's doctor visits or imaging results. (*Id.* at 842; 552-61; 429-39; 396-99.) The consultants came to a different conclusion on the extent of the accommodations that Watson would require at work, but MetLife did not brusquely dismiss the reports of attending physicians without addressing them. MetLife is under no obligation to give special weight to treating physicians.

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). The fact that MetLife came to a contrary conclusion from Watson's treating doctors after reviewing the evidence does not lessen its credibility.

### 2.   Failure to Conduct In-person Medical Evaluation

Watson argues that the MetLife consultant reports should be given less weight because, undisputedly, the consultants never conducted an in-person examination of her. On the other hand, her other doctors regularly saw her. When a plan does not require an in-person physical exam, failure to do so can "'raise[] questions about the thoroughness and accuracy of the benefits determination.'" *Montour*, 588 F.3d at 634; (quoting *Bennett*

*v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008)). As the Ninth Circuit recently noted, "[a]n insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011). On de novo review, where the Court must independently weigh the evidence, the fact that the MetLife doctors did not conduct a live, in-person physical examination of Watson lessens the weight of their conclusions vis-à-vis the conclusions of treating physicians.

### 3.   Failure to Credit Watson's Accounts of Pain

Watson also claims that MetLife improperly dismissed her evidence of pain. Indeed, in two of the physician reports, the Drs. Brenman and McPhee refer to those complaints as "subjective" and dismiss them. (A.R. at 842, 562.) Watson is correct that her persistent complaints of severe pain cannot be so easily disregarded. The Ninth Circuit has recognized in the context of ERISA that "individual reactions to pain are subjective and not easily determined by reference to objective measurements." *Saffron*, 522 F.3d at 872. It also noted that "our Social Security precedents are relevant for the factual observation that disabling pain cannot always be measured objectively—which is as true for ERISA beneficiaries as it is for Social Security claimants." *Id.* at 874 n.3. To the extent the physician consultants did not incorporate Watson's own complaints of pain, their evaluations carry less weight. Dr. Auerbach, however, does reference pain complaints and incorporated them into his ultimate recommendation. (*Id.* at 398.)

### 4.   Failure to Inform Consultants That Watson No Longer Had Insurance

Watson emphasizes throughout her brief and reply that she does not have insurance. She contends that her lack of insurance explains the lack of current treatment, an oft-cited reason in the physician consultant reports for determining that Watson was not completely disabled. The very terms of the Plan, however, place the burden on Watson, as the claimant, to present evidence to MetLife of her current treatment. The

Plan clearly requires Watson to show that "You *are receiving* Appropriate Care and Treatment and complying with the requirements of such treatment." (*Id.* at 310) (emphasis added). It goes on to specify that "[p]roof must be provided at the claimant's expense." (*Id.* at 313.) Admittedly, this clause places Watson in a bit of a catch-22: she lost her job and her insurance and therefore needs money to pay for her medical treatment, but in order to get that money from MetLife, she has to show that she is being treated. Difficult as the situation may be, the Court must evaluate the claim within the context of the agreement to which MetLife and Watson are a party. *See* 29 U.S.C. § 1104(a)(1)(D). That agreement requires Watson to present ongoing evidence of treatment. Consequently, the MetLife reports do not lose credibility for failing to indicate that her lack of treatment was due to a lack of insurance. The burden of production— heavy as it may be—falls on Watson.

### 5.    Inconsistency in MetLife's Position Regarding Watson's Disabled Status

Watson asserts that because MetLife initially awarded her disability benefits, but later denied benefits, MetLife must demonstrate that there has been some improvement in her condition sufficient to justify the denial of benefits. Such burden-shifting has no place in ERISA law. Indeed, the Ninth Circuit has maintained that, on de novo review, the burden remains with the plaintiff to prove that she was disabled under the terms of the plan. *See Muniz*, 623 F.3d at 1296 ("[D]istrict courts within this circuit have consistently held that the burden of proof continues to lie with the plaintiff when disability benefits are terminated after an initial grant. . . . We agree."). "That benefits had previously been awarded and paid may be evidence relevant to the issue of whether the claimant was disabled and entitled to benefits at a later date, but that fact should not itself shift the burden of proof." *Id.* Thus MetLife's analysis does not get less weight simply because it decided at some earlier point—when less evidence was available—that Watson was disabled.

6.      **Vocational Analyst Not Given Full Medical Record**

Watson cites the fact that the Vocational Analyst was not given her full medical record for her report as a basis to discredit the analyst's findings. The vocational analyst did have all claims notes and the report of Dr. Auerbach, which listed all of the medical evidence, as well as his specific opinion regarding limitations. (A.R. at 382.) The vocational analyst is not a physician and she could not appropriately override the opinion of the medical consultant on the core issue of limitations. The absence of all of Watson's medical records does not undermine the vocational analyst's report.

7.      **Failure to Consider SSA Decision**

Finally, Watson contends that MetLife failed to give proper consideration to the favorable SSA ruling. As an initial matter, an administrator is not bound whatsoever by an SSA award. *See Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009) ("ERISA plan administrators are not bound by the SSA's determination."). Totally different burdens are at work in ERISA and SSA cases. For example, unlike the SSA, an ERISA administrator is "not bound by the treating physician rule, which accords 'special weight' to the opinions of a claimant's treating physician." *Id.* (quoting *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003)). That said, "complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" *Id.* (quoting *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006)); *see also Salomaa*, 642 F.3d at 676. After all, "Social Security disability awards . . . are evidence of disability." *Salomaa*, 642 F.3d at 679.

Watson is correct that MetLife initially failed to address the SSA decision. The claim notes from October 21, 2010, show that MetLife attached boilerplate SSA language to its denial without meaningful review. (A.R. at 190-91.) Nor did Dr. Auerbach address the decision in his initial review. Nevertheless, while they may have not given much initial thought to the decision, unlike the administrator in *Montour*, MetLife and the consulting physicians did distinguish the SSA decision on its merits. In his April 14, 2011

addendum, Dr. Auerbach addressed the decision. (*Id.* at 399.) He pointed out that the ALJ invoked the treating physician rule—not a part of ERISA cases—when it rejected the findings of the state agency. (*Id.*) Dr. Auerbach also acknowledged that the ALJ made its decision based on the medical evidence, but that he disagreed with the medical conclusions, which is entirely appropriate under ERISA law. (*Id.* at 399-400.) He also thought the ALJ decision carried less weight because the ALJ had improperly concluded that Watson had deep vein thrombosis, when later information from Dr. Berman revealed she did not. (*Id.*) Dr. Auerbach did not disregard the SSA decision; he did, however, disagree with it and described his reasons for doing so. His opinion does not carry less weight for doing so.

### 8.    Alleged Financial Motivation

Watson theorizes in her brief that MetLife's actions betray inappropriate financial motivations. She states that MetLife cancelled her benefits only after learning about the Social Security decision, which awarded retroactive benefits that ended up in MetLife's coffers. This accusation is unsupported in the record. First, there is no evidence that MetLife pushed and prodded Watson to apply for SSA benefits. Second, the record shows MetLife learned of the SSA award only after determining that LTD benefits would be denied. (*Id.* at 188-89.) Dr. McPhee's report had been completed prior to learning of the award. (*Id.* at 552.) Therefore, the statements from MetLife's consulting physicians do not appear tainted by improper financial motivation.

In sum, the conclusions of MetLife's consulting physicians do carry a little less weight because some of those conclusions fail to reasonably credit Watson's own complaints of pain and also because none of the consultants conducted an in-person examination of Watson.

### C.    Medical Evidence

Watson must bring forth sufficient evidence to support a claim that she is disabled within the meaning of the Plan. Proving disability is not the same as proving actual injury or existence of pain. Instead, Watson must prove that her injuries and pain currently limit

her in such a way that she cannot earn more than 60% of her predisability earnings from any employer in the Tucson area "at any gainful occupation for which [she] is reasonably qualified." (*Id.* at 310-11.) In her administrative appeal, Watson focused on three impairments: her spinal injury, gastrointestinal pain, and various issues arising from the complications during the April 2010 surgery. (*Id.* at 523.)

### 1.    Spinal Injury

Chief among Watson's complaints is her back pain. The evidence is that Watson suffers from at least moderate to severe degenerative disc disease. Early notes from primary care physician Dr. Lee identify degenerative disc disease (*Id.* at 1003-11, 729), spinal specialist Dr. Lewandrowski recognized discogenic low back pain (*Id.* at 880), neurologist Dr. Badruddoja saw "a fairly arthritic back" (*Id.* at 784), surgeon Dr. Chua found "significant degenerative disc changes at L4-5" (*Id.* at 643), the SSA ALJ concluded that Watson had "degenerative disc disease of the lumbar spine," and MetLife consultant Dr. Auerbach recognized the substantial evidence of degenerative disc disease (*Id.* at 429-34). Numerous MRIs also reveal degenerative problems at L4-5. (*Id.* at 915, 914, 695, 694, 638, 639.) The physicians have all relied on these objective medical tools for their diagnoses. The Court concludes that there is sufficient evidence to conclude that Watson suffers from moderate to severe degenerative disc disease.

The question becomes what limitations to assign to Watson on account of her condition. How extensive the limitations are will determine whether there exist occupations at which Watson can still work. Here, there is significantly divergent evidence. Dr. Auerbach ultimately concluded in early 2011 that Watson could return to work so long as specific accommodations were in place, such as limits on bending and squatting, a 10 lb. limitation on lifting or carrying, and the ability to sit or stand as needed for comfort. (*Id.* at 438.) He thought a sit/stand workstation would address many of the concerns. (*Id.*) Accordingly, the Court must examine the evidence to determine whether Dr. Auerbach was correct in his conclusions.

Since a claimant's own descriptions of pain are relevant, see *Saffron*, 522 F.3d at

872, the appropriate place to begin is with Watson's own statements regarding her condition. In connection with her application for LTD benefits in late 2008, Watson stated that she was able to regularly perform light household chores, exercise for approximately two hours, shop, and rest. (A.R. at 1024.) She felt unable to "do 8 h[ours] sitting at a computer every day like [she] was doing" because she "can't sit or stand still for more than 20 min[utes] at a time." (*Id.* at 1026.) Similar statements appear in her January 2011 appeal letter. (*Id.* at 523.) At least in November 2008, Watson was open to the idea of a "treadmill work station" or working at home. (*Id.* at 1026.) But by January 2011, Watson claimed total disability. Her subjective reports of pain are important, but they are not conclusive. Her spinal problem is not the type of psychological or unexplained phenomenon where a court will typically give great weight to a claimant's own accounts. Back pain—severe as it may be—can be tested and observed.

Dr. Lee, Watson's treating physician until early 2010, opined in her January 2010 Attending Physician Statement that Watson had very limited physical capabilities and could "work a total of <1 hours a day." (*Id.* at 730.) Dr. Lee clearly indicated that Watson was severely affected by the "spinal stenosis." (*Id.* at 729.) She did not think Watson could return to work and did not expect improvement in her condition. (*Id.*) Yet she also filled out the section labeled "Restrictions." Under that category, Dr. Lee listed "No sitting or standing prolonged period[;] no lifting, bending, [or] stooping[;] [n]eed to change position often," (*id.*) limitations that seem similar to those recommended by Dr. Auerbach (*id.* at 398). Nevertheless, according to Dr. Lee, Watson was unable to work.

The EMG tests, however, which would connect Watson's complaints of pain with the degenerative issues at L4-5, were persistently normal. (*Id.* at 898-99, 795.) Twice Watson underwent the tests, and twice they registered normal readings. (*Id.*) The first time the test was performed by Dr. Davis, he recommended a second in order to confirm that the normal result was not explained by something else. (*Id.* at 898.) The second test, however, produced a similar result. (*Id.* at 785.) These results cast doubt on the connection between the MRI evidence of degenerative disc disease at L4-5 and Watson's

1    symptoms. Watson claimed to be suffering from radicular pain, and told Dr. Lee as much

2    at least as far back as March 2008. (*Id.* at 1003.) Much of Dr. Lee's analysis seems

3    predicated on the connection between the MRIs revealing stenosis and Watson's own

4    assertions regarding her pain. Dr. Badruddoja, however, in September 2009 did not find

5    any clinical evidence to support a diagnosis of radiculopathy, apparently because of the

6    EMG results. (*Id.* at 552.)

7        The MetLife physician consultants—Drs. Brenman, McPhee, and Auerbach, all

8    seized on the EMG results as proof that Watson did not put forth sufficient evidence of

9    disability. (*Id.* at 842, 557-63, 398.) They assert that the fact that the normal EMG results

10   demonstrate that the MRIs showing degenerative disc disease are not evidence of

11   disability. But there is conflicting evidence from Watson's treating physicians on the role

12   of a normal EMG. On the one hand, spinal specialist Dr. Lewandrowski stated that

13   determining whether degenerative disc disease actually causes severe pain is difficult (*Id.*

14   at 880.) And Dr. Badruddoja found no clinical radicular symptoms. (*Id.* at 784.) On the

15   other hand, Dr. Chua did not find the normal EMG results so conclusive on the issue of

16   pain: "The MRI findings are actually quite impressive. Even though she did not report the

17   typical response to the analgesic discogram, I think it would be hard to ignore the MRI

18   findings." (*Id.* at 643.)

19       The normal EMG readouts are important because Watson bears the burden to put

20   forth medical evidence that she is unable to work. Much of the evidence she has supplied

21   relates to the degenerative disc problem at L4-5, whether in the form of MRIs, doctor

22   notes, X-rays, or clinical results. If the EMG results sever the link between the

23   degenerative disc evidence and Watson's symptoms, then her evidentiary submissions for

24   her disability claim carry significantly less weight. The evidence on the EMG effect is

25   not inescapably conflicting, though. It supports a lack of radiculopathy, but not

26   necessarily a lack of connection between the degenerative disc at L4-5 and Watson's

27   complaints of pain. Thus the evidence connected to the L4-5 problem does support

28   Watson's claim, although its weight is somewhat tempered by the contrasting EMG

1   results.

2   The question of appropriate limitations remains. Keeping in mind that "Social

3   Security disability awards . . . are evidence of disability," *Salomaa*, 642 F.3d at 679, the

4   SSA ALJ found that Watson's spinal injuries caused her significant limitations. (A.R. at

5   529-35.) The ALJ considered Watson's own testimony regarding her limitations, Dr.

6   Lee's recommendations, and the MRI evidence to conclude that Watson had degenerative

7   disc disease that largely left her disabled within the meaning of the SSA. (*Id.* at 533.)

8   Often, the standard for disability used by the SSA is stricter than that used by an ERISA

9   program. *See Montour*, 588 F.3d at 636. That appears to be the case here. The Plan

10  defines disability as being "unable to earn . . . more than 60% of [Watson's] Predisability

11  Earnings from any employer in [Watson's] Local Economy at any gainful occupation for

12  which [Watson is] reasonably qualified taking into account [Watson's] training,

13  education and experience." (A.R. at 310.) In contrast, the SSA defines disability as the

14  "inability to engage in any substantial gainful activity by reason of any medically

15  determinable physical . . . impairment" that is of "such severity that [the claimant] . . .

16  cannot, considering his age, education, and work experience, engage in any other kind of

17  substantial gainful work which exists in the national economy, regardless of whether such

18  work exists in the immediate area in which he lives." 42 U.S.C. § 423(d)(1)(A), (2)(A).

19  "In other words, unlike the Plan, the SSA's standard does not take into account a

20  claimant's past earnings or location." *Montour*, 588 F.3d at 636.

21  That said, the ALJ's decision does not discuss any of the EMG findings and

22  discredited the state agency reviewer because, among other things, she was a "non-

23  treating source." (A.R. at 533.) In other words, the ALJ invoked the treating physician

24  rule, see 20 CFR §§ 404.1527(d)(2), 416.927(d)(2), as part of its determination. As

25  discussed above, there is no treating physician rule in ERISA cases. *See Nord*, 538 U.S.

26  at 825. The ERISA and SSA systems are not as similar as Watson would have them be.

27  There are different burdens and standards imposed that make direct comparisons

28  somewhat misleading. Moreover, the ALJ examined a much smaller record of medical

- 23 -

evidence than is before the Court. The report relies almost exclusively on Dr. Lee's testimony and Watson's own statements. Finally, the ALJ's analysis is quite brief. Consequently, its determination, while relevant to the question of whether Watson is sufficiently disabled under the MetLife Plan, does not hold significant sway.

In October 2010, Dr. McPhee recommended that Watson could work with specific restrictions: "Reasonable physical functional limitations given her disc degeneration at L4-5 would be to avoid lifting more than 20 pounds occasionally and 10 pounds frequently, to stoop no more than occasionally, and to be allowed brief position changes for comfort. A sit stand work station could be considered." (A.R. at 562.) Notably, the McPhee limitations were submitted to Dr. Chua, Watson's spinal surgeon, in November 2010 for his comment, since he had not submitted any new information in connection with MetLife's review of Watson's records. (*Id.* at 196, 562.) His secretary told a MetLife case manager that he agreed with the report from McPhee, including the recommended limitations. (*Id.* at 196-97.) Later that day, Dr. Chua's office faxed back McPhee's report with the handwritten notation at the top "Dr. Chua reviewed and agree[d] w[ith] questions. (He Agreed.)" (*Id.* at 546) (emphasis in original). On the second page, where Dr. McPhee's recommended limitations were listed, there is a handwritten note "Agree w[ith] below." (*Id.* at 547.) The only portion of Dr. McPhee's report that Dr. Chua disagreed with was the assertion that Dr. Chua did not respond to MetLife's request for medical information. (*Id.*)

These comments are significant. Dr. Chua was the last physician to have regularly examined Watson's spine and worked with her on alleviating the pain. Although he had not seen Watson for almost five months, he nevertheless agreed that Watson could work, provided that appropriate limitations were in place. Dr. Chua subsequently wrote a letter in January 2011, in which he reiterated that he believed Watson would "likely continue to have low back pain related to the L4-5 degenerative disc", but he did not recommend any additional limitations. Thus the November 2010 comments are the last indication of what Dr. Chua thought regarding appropriate limitations. And it appears he was in agreement

1    with Dr. McPhee on what limitations should be. Watson insists that MetLife erred by not

2    consulting Dr. Lee, but Watson never included any information from Dr. Lee in her

3    appeal.

4            When Dr. Auerbach reviewed Watson's claim, he did not dismiss the MRI

5    findings and Watson's own pain reports, even in the face of a normal EMG reading. He

6    recognized the significant evidence that Watson suffered back pain as a result of the

7    problems at L4-5, and proposed relatively significant workplace limitations. (*Id.* at 398.)

8    These limitations— no more than 10 lbs. lifting, ability to sit and stand for comfort, and

9    twisting restrictions—were based "primarily [on] the MRI findings and subjective

10   complaints." (*Id.*) These are stricter restrictions than those recommended by Dr. McPhee

11   and agreed with by Dr. Chua. Moreover, the language is similar to that used by Dr. Lee to

12   describe Watson's condition—"[n]o sitting or standing prolonged period, no lifting,

13   bending, stooping Need to change position often"—although Dr. Lee did state that

14   Watson would likely be unable to work. (*Id.* at 730.) There appears to be some consensus

15   on the limiting effects of Watson's spinal condition.

16           The evidence sufficiently demonstrates that Watson suffers from moderate to

17   severe degenerative disc disease that causes her lower back pain. While the EMG

18   findings indicate that the MRI evidence may not be conclusive, there is sufficient

19   consensus among the physicians that Watson suffers from a spinal condition. She

20   experiences pain and that pain at times is severe and may require surgery. Nevertheless,

21   there also appears to be general agreement that Watson could work if the appropriate

22   limitations were in place. Drs. McPhee, Auerbach, and Chua all agreed on the basic

23   limitations. The dissenters are Dr. Lee and Watson herself. One year elapsed from Dr.

24   Lee's last treatment until Watson's appeal of denial of benefits. In that time, Watson

25   received a variety of treatments, and even underwent unsuccessful surgery. In light of the

26   Plan's specific requirement that Watson provide up-to-date information about treatment,

27   Dr. Lee's statements carry less weight. Moreover, Dr. Lee does not appear to have

28   expertise in the area. Dr. Chua, however, does, and he felt that working with restrictions

1    was possible. The Court is persuaded that Watson could work, provided the strict

2    restrictions recommended by Dr. Auerbach were in place.

3                        **2.        Gastrointestinal Pain**

4           Watson also listed GI pain as a factor in her disability claim. (*Id.* at 523.) She

5    stated that she was diagnosed with Crohn's disease by Dr. Tamura. (*Id.*) There is no

6    support for this claim in the record. Although Dr. Lee listed "Crohn's disease" as one of

7    her objective findings in the January 2010 report, Dr. Lee had no hard evidence of

8    Crohn's disease. Dr. Lee referred Watson to Dr. Tamura in the fall of 2009 to run tests

9    for Crohn's disease/IBS/IBD. (*Id.* at 427.) Those tests were inconclusive as to both

10   Crohn's disease or IBS/IBD. Dr. Tamura concluded that "NO conclusion can be made

11   regarding whether the patient has Crohn's disease. . . . Certainly the patient has

12   symptoms compatible with irritable bowel syndrome (IBS). . . ." (*Id.*) Watson last saw

13   Dr. Tamura on February 18, 2010, and no other treatment has occurred. (*Id.* at 526.) At

14   most, then, Watson has some level of IBS.

15          As far as whether her IBS symptoms would affect her ability to work, the evidence

16   is clear that they would not. As part of Watson's appeal of denial of benefits, Dr. Tamura

17   submitted a letter about her condition. (*Id.*) In that letter, he opined that Watson "has an

18   inflammatory condition that . . . appears indistinguishable from inflammatory bowel

19   disease (IBD) or Crohn's disease." (*Id.*) The letter describes the need for strict diet

20   regulation and special food preparation, but does not describe any specific workplace

21   limitations. However, Dr. Tamura submitted a second letter of clarification after Dr.

22   Auerbach found that there was no evidence of limitations due to the GI pain. (*Id.* at 429.)

23   In it, Dr. Tamura stated that he could not make any conclusion on the existence of

24   Crohn's disease and "agree[d] with the report quoting that no functional impairment of

25   the patient is attributed to the above finding in the claim." (*Id.* at 427.) Consequently,

26   there is agreement among Drs. Tamura, Auerbach, and McPhee that the Watson's GI

27   problem, while uncomfortable, is not sufficiently serious as to require additional

28   limitations on Watson's ability to work.

### 3.    Issues Arising from April 2010 Operation

The final condition underlying Watson's disability case is that she was suffering from the complications of her unsuccessful April 2010 surgery. During that surgery, her iliac vein was somehow nicked and Dr. Berman performed ligation on the vein to stop the bleeding. (*Id.* at 524.) In her appeal letter, Watson described "a lot of stabbing pains in my groin and right knee, and muscle spasms and throbbing all the way down the leg." (*Id.* at 523.) After sitting for longer than 20 minutes, Watson reports that "the pain intensifies and sometimes my leg will start to swell, and my vein bulges out. When this happens I have no choice but to lay down and elevate my leg." (*Id.*) Similar statements appear in her January 2011 MetLife appeal letter, where she repeats the fact that she is unable to sit or stand for longer than 20 minutes because of her spinal issue and now must lie down to elevate her leg because of complications from the April 2010 surgery. (*Id.* at 523.) Largely on the basis of this testimony, the ALJ found evidence of "deep venous thrombosis prophylaxis from the date of the surgery to at least July 1, 2010. . . . Dr. Scott S. Berman, M.D. reported that the claimant is at further risk for venous problems due to the surgical error." (*Id.* at 532.)

Both Dr. Chua and Dr. Berman said otherwise in their appeal letters. While acknowledging the surgical error and subsequent six-week treatment, Dr. Chua stated that "a follow-up vascular imaging study . . . did not show any evidence of complications related to ligation of the common iliac vein. . . . During her postoperative visits by me, she did not develop any further issues regarding the common iliac vein injury or treatment." (*Id.* at 524.) Similarly, Dr. Berman wrote that, as of his last visit with Watson on June 11, 2010, "she had no apparent sequelae as a result of the venous injury that took place during her spine surgery. She had no swelling or secondary venous changes in her skin. . . . A subsequent venous duplex scan done in our office in July of 2010 demonstrated patent lower extremity veins without evidence of deep vein thrombosis." (*Id.* at 421.) Both treating physicians opined that there were no lasting effects as of summer 2010, the last time Watson visited them. Their reports directly contradict the

findings by the SSA ALJ and consequently undermine his conclusions on that matter.

No physician has stated that the April 2010 surgical complications would restrict Watson in any way from performing work. All the remains are Watson's own complaints about the current pain. The Court does consider those complaints in the balance, but must recognize that under the Plan, the burden rests on Watson to present up-to-date medical evidence that she is suffering from those complications, even though she does not currently have insurance. (*Id.* at 177.) The medical evidence of lasting issues from the April 2010 operation is scarce.

### 4.    Total Effect

After examining each condition in isolation, the Court must also consider the aggregate effect of Watson's conditions. *See Peterson*, 2007 WL 1624644 at *26-30. "The appropriate question [is] not simply whether any single condition [is] sufficient to warrant a finding of total disability, but also whether the combination of all of [claimant's] objectively demonstrated conditions indicated the presence of total disability under the Plan." *Id.* at 26. As discussed above, Watson has not presented sufficient medical evidence to conclude that her GI and vascular conditions in isolation necessitate any workplace limitations. Her treating physicians and MetLife's consultants concluded that there are no functional limitations resulting from those conditions. The primary issue centers on Watson's spinal condition. The evidence surrounding Watson's spinal condition demonstrates significant problems at L4-5. Taken in combination with Watson's averments of GI and vascular pain, there is sufficient evidence to conclude that Watson would require significant workplace limitations in order to make a return to work possible.

In her brief, Watson also discusses the effect of her chronic pain and prescription regimen on her ability to concentrate. There is no evidence in the record on Watson's medication and its effects. Dr. Auerbach speculated in his addendum that Watson is likely still taking narcotics, but noted that there was no up-to-date information on her medications. (A.R. at 398.) He further speculated that, if she was taking the same

narcotics, her concentration would be affected but not in any way that would impair her ability to perform her work. (*Id.*) No further medical evidence is available.

Like Dr. Chua, the Court agrees with the analysis of Dr. Auerbach that Watson could potentially return to a sedentary job if certain provisions were made. First, she would need the ability to frequently alternate sitting and standing. Second, there must be a limit of 10 lbs. on lifting. Third, her workstation would have to be structured to minimize any bending, twisting, or squatting. These limitations sufficiently incorporate the objective findings of the MRI and physician evidence, as well as Watson's own complaints of pain due to the combination of her spine, GI, and vascular conditions.

### D.   Employability Analysis

The fact that Watson can work with specific restrictions, however, does not end the inquiry. The ability to work with specific restrictions does not mean that such work is actually available in the Tucson area. The Plan requires that jobs be available where Watson could earn 60% of her pre-disability wages, taking into account her training and experience. (A.R. at 310.) MetLife's own medical consultants, however, recognized that Watson could return to sedentary-level work only if there were appropriate limitations in place. Where the claimant has significant impairment, consideration of vocational evidence is usually warranted to determine whether there are positions available where the claimant could work with those restrictions. *See McKenzie v. Gen. Tel. Co. of Cal.*, 41 F.3d 1310, 1316-17 (9th Cir. 1994), *abrogated on other grounds by Saffron*, 552 F.3d at 872 n.2.

After Dr. Auerbach filed his final consultant report, MetLife submitted Watson's file to a vocational analyst. (A.R. at 389.) The vocational analyst's report incorporated the restrictions recommended by Dr. Auerbach: "According to the MetLife case notes provided for review, Ms. Watson is diagnosed with neuropathy and radiculopathy. According to the Physician Consultant Review Addendum dated 04/14/2011, Ms. Watson is able to lift up to 10 lbs. She would require the ability to sit or stand for comfort, She would require accommodations to limit bending, twisting or squatting." (*Id.* at 382.)

1    As before, the ultimate burden rests on Watson to provide "proof" that she meets

2 the Plan's definition of disability. MetLife's vocational analyst reported three

3 occupations that were available in the Tucson Area that fit Watson's commensurate wage

4 level: Service Clerk, Order Clerk, and Repair Order Clerk. (*Id.* at 383.) The only

5 information available about working conditions in the occupation chart is "Strength",

6 which for all three is listed as "Sedentary." (*Id.*) While Watson needs some sort of

7 additional accommodation in her sedentary employment, such as a sit/stand work station,

8 she has not pointed to any evidence in the administrative record that contradicts the

9 findings of the vocational analyst.

10    Instead, Watson attached to her trial brief a printout from "SkillTRAN" that seems

11 to provide greater detail on the three occupations. (Doc. 32-1 at 5-15.) She emphasizes

12 that the printouts state that the jobs recommended by the vocational analyst involve lots

13 of sitting and do not contain any reference to alternative work stations. The Court,

14 however, would not expect that the availability of seating accommodations to be

15 indicated on such printouts. The absence of such information does not serve as evidence

16 that the job is incapable of providing the accommodations mentioned.  Moreover, on de

17 novo review, the Court typically confines itself to review of the administrative record

18 alone. *Opeta v. Nw. Airlines Pension Plan for Contract Emps.*, 484 F.3d 1211, 1217 (9th

19 Cir. 2007.) Consideration of extrinsic evidence is appropriate only in the limited

20 circumstances identified in *Mongeluzo v. Baxter Travenol Long Term Disability Benefit*

21 *Plan*, 46 F.3d 938 (9th Cir. 1995). Under this strict standard, a "district court should

22 exercise its discretion to consider evidence outside of the administrative record '*only*

23 when circumstances *clearly establish* that additional evidence is *necessary* to conduct an

24 adequate de novo review of the benefit decision.'" *Opeta*, 484 F.3d at 1217 (quoting

25 *Mongeluzo*, 46 F.3d at 944). Situations where extrinsic evidence was necessary include

26 illegible medical records, complex medical questions, issues of credibility, and actions by

27 the administrator to prevent the claimant from presenting medical evidence of his claim.

28 *Id.* Watson had opportunities to submit information demonstrating that there was not

available work in the Tucson area that would accommodate her need to frequently stand or change position and she did not do so.  Thus, nothing in the present dispute resembles the level of necessity identified in *Opeta*. Consequently, the Court excludes from consideration the evidence attached by Watson to her Brief.

The Court concludes that Watson failed to provide sufficient evidence that she could not find work that would offer her the accommodations recommended by her physicians and Dr. Auerbach. The vocational analysis took those accommodations into account, and Watson has not pointed to any rebutting evidence in the record. Accordingly, she is not disabled within the meaning of the Plan.

### D.    Responsibility to Provide Watson with Plan Documents

Although Watson argued that she was entitled to discretionary statutory penalties under ERISA for MetLife's alleged failure to provide her with the plan documents, she concedes in her Reply Brief that MetLife does not have that responsibility because it is not the Plan Administrator. (Doc. 40 at 11.) She is not entitled to recover penalties from MetLife as a result.

### CONCLUSION

The Court has determined that Watson is able to work so long as the limitations specified by Dr. Auerbach are available. It appears that jobs are available in Watson's geographic area that could meet her needs.

**IT IS THEREFORE ORDERED** that Watson's request for LTD benefits is denied.

Dated this 7th day of November, 2012

*A. Murray Snow*

G. Murray Snow
United States District Judge